```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3                       —   —   —

      BARBARA KENDRICK, et al.,
 4
                 Plaintiffs,
 5
       v.                              Case No. 21-12995
 6
      FCA US, L.L.C.,                   Hon. Matthew F. Leitman
 7
                 Defendant.
 8    _____/

 9            DEFENDANT'S MOTION TO DISMISS
        PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT
10
           BEFORE THE HONORABLE MATTHEW F. LEITMAN
11              United States District Judge
           Theodore Levin United States Courthouse
12             231 West Lafayette Boulevard
                    Detroit, Michigan
13            Monday, September 26, 2022

14
      APPEARANCES:
15
      For the Plaintiffs:      NICHOLAS A. COULSON
16                             LANCE T. SPITZIG
                               LIDDLE SHEETS COULSON, PC
17                             975 E. Jefferson Avenue
                               Detroit, MI 48207
18                             (313) 392-0015

19    For the Defendant:       STEPHEN A. D'AUNOY
                               THOMPSON COBURN, LLP
20                             ONE US Bank Plaza
                               Saint Louis, MO 63101
21                             (314) 552-6354

22

23

24        To obtain a copy of this official transcript, contact:
            Robert L. Smith, Federal Official Court Reporter
25           (313) 234-2612 • robert_smith@mied.uscourts.gov
```

*Motion to Dismiss • September 26, 2022*

```
 1                    TABLE OF CONTENTS

 2   MATTER                                        PAGE

 3   DEFENDANT'S MOTION TO DISMISS
     PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT
 4     Motion by Mr. D'Aunoy.............................. 7
       Response by Mr. Coulson...........................23
 5     Ruling by the Court...............................31

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1 | Detroit, Michigan

 2 | Monday, September 26, 2022

 3 | at about 9:26 a.m.

 4 |                            —   —   —

 5 |            (Court and Counsel present.)

 6 |            THE LAW CLERK:  All rise.

 7 |            The United States District Court for the Eastern

 8 | District of Michigan is now in session, the Honorable

 9 | Matthew F. Leitman, United States District Judge, presiding.

10 |            You may be seated.

11 |            The Court calls Case No. 21-12995, Barbara Kendrick

12 | v. FCA US, LLC.

13 |            THE COURT:  Good morning.  Who is here for the

14 | plaintiffs, please.

15 |            MR. COULSON:  Nick Coulson for the plaintiffs, and

16 | with me is my colleague, Lance Spitzig.

17 |            THE COURT:  Good morning.

18 |            MR. D'AUNOY:  Good morning, Your Honor.

19 | Stephen D'Aunoy, from Thompson Coburn, for FCA US.

20 |            THE COURT:  Thank you for coming up from St. Louis.

21 | I appreciate you making the trip.

22 |            All right.  We are here for argument on the

23 | defendant's motion to dismiss, but I wanted to ask a question

24 | of the plaintiffs before I turn to Mr. D'Aunoy.

25 |            One of the things that I normally do and didn't do

```
 1    in this case, because there were two motions filed out of the
 2    gate, a motion to remand and a motion to dismiss, is normally
 3    when I get a motion to dismiss, I immediately issue an order
 4    granting leave to amend the complaint.  You guys didn't ask
 5    for leave to amend -- at least I didn't notice it in your
 6    response.
 7             Is it your position that you could amend this
 8    complaint to address some of the issues that the defendant
 9    raises in their motion?
10             MR. COULSON:  Your Honor, actually, the Court did
11    provide us that opportunity in the Zoom argument that was
12    held on the remand motion.  There was some discussion about
13    that, and I think, in the order, actually we had the
14    opportunity to amend if we were going to.  We certainly think
15    that there is no friction between the law and the fact
16    pattern here, such that if the Court were inclined to grant
17    the motion, that we could amend it, but for reasons that we
18    set forth in the brief, we obviously don't think that it's
19    necessary.
20             THE COURT:  Hold on.  I want to make sure I
21    followed what you said there.  So you are saying that I
22    actually did give you guys an opportunity to amend the
23    complaint?
24             MR. COULSON:  I think -- if I recall correctly, the
25    Court's order on the motion to remand mentioned a deadline by
```

```
 1   which we might amend the complaint, if we so chose, and then
 2   provided a deadline for us, if we determined that we did not
 3   want to amend the complaint, to respond to the already then
 4   pending motion to dismiss.
 5           THE COURT:  I see it here.  So No. 31, you guys
 6   filed a notice of not filing a second amended complaint.
 7           MR. COULSON:  That's right, that's right, we did do
 8   that.
 9           THE COURT:  Is it your position that you could add
10   additional allegations on the points where they are
11   challenging your claim?
12           MR. COULSON:  Absolutely, Your Honor, we could.
13   It's just the fact that they'd be illustrative of things that
14   we believe we've already said, that are not implicated by the
15   federal pleading standard.
16           THE COURT:  But why didn't you take me up on that
17   offer to file an amended complaint?
18           MR. COULSON:  We don't believe it's a meritorious
19   motion, Your Honor.  We think -- as we -- it's sort of become
20   a rogue thing that when you're removing something from a fact
21   or notice-pleading state, whichever it is, that if the
22   complaint was filed in state court, the defendant wants to
23   file a 12(b)(6).  We think the complaint here is replete with
24   averments that, especially when taken with a reasonable
25   inference --
```

1      THE COURT:  I'm not saying I'm going to grant this

2   motion, but if you think this complaint is some sort of a

3   model complaint for nuisance or replete with sufficient or

4   broadly sufficient or obviously sufficient factual

5   allegations, I think you and I, respectfully, have a

6   difference in our view of the pleadings.

7      I mean -- I guess I'm scratching my head in terms

8   of why a litigant would run the risk of not taking up an

9   offer to amend.  I mean, it seems to me to be standing on a

10   principle that's not worth it.

11      MR. COULSON:  It's a timing issue, Your Honor.

12   These people are putting up with this thing every single day.

13   We have already spent some time litigating the issue of

14   jurisdiction, and we want to get into discovery as quickly as

15   possible.  If that's the Court's view of things and if the

16   Court ultimately is inclined to grant the motion, of course

17   it's something that we're happy to do.

18      THE COURT:  No, no.  If I grant the motion, you're

19   going to Cincinnati.  That was the point of my order.

20   The -- the reason I do these orders is to save judicial

21   efficiency.  The point is, I will do a deep dive into a

22   motion to dismiss, I've done it here.  I spent time on

23   Friday, over the weekend and again this morning, reading the

24   cases, doing my own research, reading your complaint.  I have

25   a finite amount of time for each case.  And the point of this

1   order -- if I issued my usual order, I would have put it in

2   there, this is your chance to amend, take it or leave it.  I

3   guess I just don't understand that.  But, anyway, I will then

4   take up the complaint as filed.

5           Mr. D'Aunoy, would you come to the podium?

6           MR. D'AUNOY:  Yes, Your Honor.

7           THE COURT:  Is it really Chrysler's position -- or

8   FCA, whatever the hell they're going by these days, that they

9   can open up a plant in a residential neighborhood and spew

10  out noxious fumes that prevent people from comfortably

11  utilizing their property without any consequences in a court

12  of law?

13          MR. D'AUNOY:  No, Your Honor.  That is not our

14  position, and I hope that the Your Honor didn't interpret our

15  motion as taking that position.

16          I think Your Honor's identified one of the primary

17  issues here.  We're not saying that plaintiffs here, or any

18  plaintiff, could never state a claim, Your Honor.  What we've

19  attacked here is the actual factual allegations of this

20  complaint on the basis that they are -- they are just too

21  thin to state a claim under the applicable laws.

22          I don't think there is any real disagreements,

23  here, between plaintiffs and FCA US, in terms of the

24  standards, but what we have here and what I think Your Honor

25  has alluded to is simply a complaint that is simply too thin

1    on the facts.

2         As to these two named plaintiffs, Your Honor, they

3    don't allege significant harm; they don't allege how they

4    have been impacted by any odors.  And one thing we have here,

5    Your Honor, is this is a case about an odor.  You know, a lot

6    of the case law that's developed in some of the cases that

7    we've cited and some of the cases that plaintiffs have cited

8    and we've distinguished, this is not a case where there is

9    some plant or some company emitting toxic compounds that are

10   landing and staying on a plaintiff's property.  It's not in

11   the ground water, it's not on the ground, there is no

12   fallout.  What we have here are allegations purely of an

13   odor.

14        If you read between the lines, and not that the

15   plaintiffs have even said this themselves -- is that they are

16   sitting on their porch and they have a bad smell that, you

17   know, wafts with the wind and then it goes away, and then

18   maybe another day, it comes back.

19        But the attack here, by FCA US, is on the

20   factual-pleading standard under the Federal Rules of Civil

21   Procedure and have the plaintiffs, here, pleaded the facts

22   necessary to state a nuisance claim, and have they pleaded

23   the facts necessary to state a negligence claim.  And I

24   think, Your Honor, we make a pretty good case in our briefing

25   that they have not.

1   THE COURT:  As I said, this was an unusual case in

2   that right out of the box, we saw two motions, the motion to

3   remand and the motion to dismiss.  And in the motion to

4   remand, I found that the allegations were -- did state a

5   claim seeking damages greater than $75,000, and one of the

6   ways I got there was by saying that these plaintiffs, they

7   identify the complaints by other people, but then they say

8   that their claims -- their own claims, those are the named

9   plaintiffs, are typical of the other people, and so

10  essentially bootstrapping and saying, well, if your claims

11  are typical of the other people and the other people are

12  having all of these problems, then is it a reasonable

13  inference from the pleadings that you're having all of these

14  problems, too.  Why can't I do that in the context of this

15  motion, as well?

16        And before you answer, I want to be clear, I'm not,

17  in this case, making the error that you guys point out that

18  you -- an individual plaintiff in a class claim can't have

19  standing based on other people's injuries.  I get that.

20  That's, emphatically, not my question here.

21        My question is, why isn't it reasonable to read

22  this complaint as essentially saying, in an unartful way, we

23  have these same injuries, too?

24        MR. D'AUNOY:  Your Honor, and I realized -- and I,

25  like you, was working on this over the weekend and again this

*1*    morning -- there that is tension there, because you did find

*2*    that the amount in controversy, here, is over 75,000, but I

*3*    think we are dealing with different standards, because when

*4*    you're talking about the amount in controversy, I think that

*5*    you read the complaint very broadly, you make all of your

*6*    inferences, and what have they really put in controversy?

*7*        But now we are talking about the federal pleading

*8*    standard and what is plausible and what they have stated in a

*9*    factual way, not in a -- in a could-this-possibly-be way.

*10*    And when we look at the named plaintiffs' facts here, they

*11*    don't say that they, themselves, have had a headache, or that

*12*    they, themselves, have had to change their lifestyle, or that

*13*    they, themselves, have tried to sell or rent their home and

*14*    the value has gone from X to Y.  They don't say that they,

*15*    themselves, have suffered anything, with any factual basis.

*16*        You know, Your Honor, I mean, paragraph 23, and

*17*    I'll just point it out, this is probably the closest they

*18*    come to saying anything.  They say that the plaintiffs have

*19*    suffered -- caused them to suffer, and I will quote,

*20*    "substantial temporary physical discomfort," Your Honor, but

*21*    that's simply conclusory.  You know, that is -- there's no

*22*    facts there to back it up.  They don't say that, you know,

*23*    they got a headache and they had to seek treatment.  They

*24*    don't say they felt nauseous and had to seek treatment.

*25*        And the pleading standards, Your Honor, as we view

```
 1    it, and I think as the law supports our view, is that you
 2    have to plead facts that bring your situation within the
 3    elements of the claim, and they haven't done that with
 4    respect to their own facts, their own claim.  And I don't
 5    think, in terms of pleading, that we get to -- that we get to
 6    give them every benefit of the doubt in terms of, you know,
 7    but they said that Mr. Smith, their neighbor, had a headache
 8    and then they, in a class-allegation section of their
 9    complaint, say, we're typical of everyone.  I think that they
10    need to actually state what it is about them or how they were
11    impacted by these alleged odors, in order to state a viable
12    claim, Your Honor.
13         THE COURT:  Isn't it plausible, even though -- I
14    should say, even if I were to agree with you that temporary
15    physical discomfort is conclusory -- and I'm not necessarily
16    there yet -- why isn't it plausible or reasonable to say
17    they've pleaded a lot of facts about the condition generally,
18    that they say it's a noxious odor and they give examples of
19    how it's affecting people.  I mean, isn't it plausible to say
20    they would be affected in the same way?
21         MR. D'AUNOY:  Well, they have not come out and said
22    that, Your Honor.  I mean, I think what we're dealing with is
23    we have two named plaintiffs, here, who are tasked with
24    pleading an individual claim before we even get to the class
25    issues.  What they've done, here, is, in terms of trying to
```

1　make out the class allegations, they've told us a whole lot

2　about other people, but what they haven't told us -- and I

3　think it's telling, what they haven't told us is about their

4　own situation.  They don't say that they, themselves, have

5　suffered the same harms as the individuals that they set

6　forth in paragraph 21.

7　　　　And I think, Your Honor, again, going back to how

8　we started this, you know, if it's the case that they

9　plaintiffs did suffer these same harms; that they had the

10　headaches, they had the nausea, they can't use their

11　properties the same way, I could see that Your Honor might be

12　having a different take on this motion to dismiss, but we

13　don't have that situation.

14　　　　Plaintiffs had an opportunity to plead those facts,

15　they didn't, and I think there's something to be read

16　into -- in between the lines about that as well, Your Honor,

17　in terms of, did they have these same things, because if they

18　did, why wouldn't they tell us?

19　　　　THE COURT:  What do you make of combining

20　paragraph 16 with 23?  So paragraph 16 says that the odor

21　that's emitted has been described as a very strong, foul odor

22　that can be smelled both inside and outside.  And why isn't

23　it enough to say there's a very strong odor and it causes me

24　substantial temporary physical discomfort?

25　　　　MR. D'AUNOY:  Well, Your Honor, I mean, I think we

1   have to take the pleadings -- the facts pleaded as they are,

2   and the fact pleaded in paragraph 16 is that the odor has

3   been described by someone.  It doesn't say that the

4   plaintiffs, themselves, have experienced this odor both

5   inside and outside their home, and it's a strong odor.  I

6   think we have to take the facts as they're pleaded, Your

7   Honor.

8          THE COURT:  Look, paragraph 15 says, plaintiffs'

9   property, including their residences and yards, have been

10  physically invaded by noxious odors, and then 16 is just

11  describing the odors.

12         MR. D'AUNOY:  That they are foul and -- yes, Your

13  Honor, I do see that, when we put those two together, I think

14  you can make a reasonable inference that there is a strong

15  foul odor that plaintiffs' property has been, quote/unquote,

16  invaded by.

17         But then we get into, what do plaintiffs say about

18  how that's impacted them, and I think that's the hurdle.  And

19  at least as we briefed it, Your Honor, that's the hurdle they

20  don't get over, in terms of a nuisance claim pleading the

21  significant harm, how has it harmed them?  And in terms of

22  the negligence claim, pleading the actual present injury, I

23  think, are the standards that we've identified that must be

24  pleaded, in terms of stating a viable claim.

25         THE COURT:  Give me one second.  In the -- in terms

1    of whether the injury is substantial enough, one of the cases

2    that you guys cite -- I think both sides cite -- is the

3    Michigan Supreme Court's decision in the *Atkins* case.  This

4    case dealt with an issue that's not present in our case,

5    namely, whether depreciation of property value, alone, can

6    state a nuisance claim where there's actually no invasion.

7             But the court was describing nuisance, and they

8    said -- this is the Supreme Court, "There are countless ways

9    to interfere with the use and enjoyment of land, including

10   interference with the physical condition of the land itself,

11   disturbance in the comfort or conveniences of the occupant,

12   including his peace of mind."  And then it goes on to say,

13   "The essence of private nuisance is the protection of a

14   property owner's or occupier's reasonable comfort in

15   occupation of the land in question."

16            So if that's the essence of a nuisance and they're

17   alleging here that there were noxious odors that invaded

18   their land and inside their house, isn't it plausible to say

19   that a reasonable person would have their reasonable comfort

20   disturbed by that?

21            MR. D'AUNOY:  Your Honor, and I'm going to get to

22   your answer, I'm not trying to avoid it.  But I think what we

23   can take from *Atkins* is two things.  I think it's all clear

24   that we're not dealing with the physical invasion, because we

25   don't have a situation where there's any compounds or

1    anything landing or staying on plaintiffs' property.  So what

2    we are dealing with --

3         THE COURT:  We have a physical invasion.  It enters

4    the property.  *Atkins*, nothing entered the plaintiff's

5    property, the contaminants were all offsite, and the nuisance

6    argument was that the contaminants related near my property

7    caused the value of the property to depreciate.  There wasn't

8    a claim in *Atkins*, as I understand it, that odors or anything

9    was coming onto the property.  Here, the smell is coming onto

10   the property, the gases, whatever the heck they are.

11        MR. D'AUNOY:  Yeah, but my only point, Your Honor,

12   is it doesn't stay, it blows with the wind.  At least if you

13   take plaintiffs' allegations, you know, it's temporary, it

14   comes and goes, those types of things.

15        But getting to Your Honor's question about the

16   peace of mind and the invasion of my use and enjoyment.  We

17   don't dispute that you can state a valid claim if you have

18   factual allegations saying, how did it impact your use and

19   enjoyment?  I don't think that the Court should -- or I

20   honestly don't think the Court is allowed, that's FCA's

21   position, to just infer that if something smells bad, that it

22   has somehow impacted someone's use and enjoyment in a way

23   that causes significant harm.

24        I think that in order to state a viable claim, we

25   need those facts.  How did it affect your use and enjoyment?

```
 1   How did that effect on your use and enjoyment result in
 2   significant harm to you?  Because just saying I smelled
 3   something bad, I don't think gets plaintiffs over the hump.
 4   Now, if plaintiffs were to say I smelled something bad on my
 5   property and I wasn't able to do X, or I wasn't able to sell
 6   my property, I wasn't able to rent my property, I wasn't able
 7   to use my property in this way, those were the types of facts
 8   that, I think, have been accepted by other courts, but we
 9   don't have that here, Your Honor.  We don't have these two
10   named plaintiffs saying anything about their situation, in
11   terms of how this has impacted their use and enjoyment of
12   their property.
13        THE COURT:  Is the federal pleading standard a
14   fact-pleading standard or a notice-pleading standard?
15        MR. D'AUNOY:  Absolutely a fact-pleading standard,
16   Your Honor.  I mean, we go back to *Iqbal*, plaintiffs must
17   plead facts.
18        THE COURT:  But ultimately, it's plausibility,
19   right?
20        MR. D'AUNOY:  That is, Your Honor.  I mean, those
21   facts, you have to disregard the conclusions, you have to
22   disregard, you know, the -- you know, the pleading, just
23   trying to match up the elements, the conclusory assertions,
24   and you have to look only at the facts, and you are able to
25   draw reasonable inferences from those facts.
```

1     But here, Your Honor, when we're looking for facts

2  about how this impacted them, there aren't any.  And I am

3  still standing up here amazed, Your Honor, at -- if these two

4  plaintiffs actually had situations like other people they've

5  described, why wouldn't they just tell us?  They did (sic)

6  and I think that's telling.  I think that Your Honor can't

7  draw an inference that these people were harmed in the same

8  way as other people without a specific pleading saying,

9  I'm -- I have the same headache as Mr. Smith, I felt the same

10  nausea as Ms. Jones.  We don't have that here.

11     THE COURT:  Let me push back on that a little bit.

12  At some level, if a harm is strong enough, it would be

13  reasonable to infer that everybody in the area suffered it.

14  Let's take a noise nuisance, because there's Michigan case

15  law on noise nuisance.  If it was a deafening noise -- you

16  know, I don't know what the decibel number is, but if the

17  nuisance was a very, very loud noise that was -- put

18  somebody's hearing at risk it was so loud, and the

19  person -- the plaintiff pleaded, here, was the noise coming

20  out of this factory, it was at this decibel level, this

21  decibel level is dangerous to hearing.  You could -- couldn't

22  you plausibly infer that the particular plaintiff would

23  suffer that, if that's the general impact of the harm?

24     MR. D'AUNOY:  Your Honor, again, I mean, I think it

25  would depend on the factual circumstances.  I mean, if that

1   plaintiff said I was, you know, in my -- on my front porch
2   when that noise was made, you know, I heard that noise and
3   that noise, you know, hurt my hearing.  You know, those are
4   the type of facts I think that would get you over the hump.
5           But if a plaintiff just came in and said, I live in
6   this neighborhood, and on X, Y, Z date, there was this
7   horrendous noise that passed through the neighborhood; we
8   don't know if that plaintiff was there, we don't know if that
9   plaintiff was inside.  We don't know how that affected that
10  plaintiff.
11          THE COURT:  But he says there was that horrible
12  noise on this date and this noise is loud enough to deafen
13  people and make them nauseous, or whatever he pleads, and
14  then he says the noise caused me substantial temporary
15  discomfort.  You're saying that wouldn't be enough; there
16  would have to be some additional facts about it was a
17  headache, it was watering eyes, whatever?
18          MR. D'AUNOY:  Well, how did that noise interfere
19  with this particular plaintiff's use and enjoyment?  We're
20  talking about two particular plaintiffs here, Your Honor, and
21  in your case, we would be talking about the plaintiff there.
22  In order for that plaintiff to plead a viable claim on their
23  own behalf, they would have to describe how it impacted their
24  use and enjoyment.
25          THE COURT:  Okay.  What else do you want to tell

 1  me?

 2        MR. D'AUNOY:  If you don't have any other

 3  questions, Your Honor, I would touch on the primary

 4  jurisdiction argument, Your Honor.

 5        THE COURT:  Actually, I do have a question.  Why is

 6  that at play here?  In other words, the EGLE or whatever the

 7  state agency, they're looking at a set of technical issues,

 8  compliance with the Clean Air Act and regulations here.  I

 9  don't understand those federal regulations or state

10  regulations, whatever they are, to preempt the common law

11  claim here, correct?

12        MR. D'AUNOY:  We are not arguing preemption here,

13  Your Honor.

14        THE COURT:  So if there's no preemption, doesn't

15  that signal that these are looking at different things?  That

16  whatever EGLE comes up with, it is compliant with the Clean

17  Air Act or it is not, it could be 100 percent compliant, but

18  still be noxious and nasty and qualify as a nuisance; isn't

19  that right?

20        MR. D'AUNOY:  Well, there's a couple different

21  things going on here, Your Honor.  It's not our position that

22  whatever EGLE does is going to bind this Court and that this

23  case is going to go away.  What we are saying is, as we

24  speak, EGLE, FCA, other agencies, are hard at work coming up

25  with a final resolution to this issue.

1    THE COURT:  By the way, did you see the news story

2   on this last week?

3    MR. D'AUNOY:  Yeah, and that's partially there.  I

4   mean, they're still working on permits and other things, so

5   it's not over, it's not done.

6    THE COURT:  But the news story was interesting

7   because the news story, at least the way it was pitched, and

8   I don't believe everything that I read, but the story was

9   EGLE and FCA celebrating a major solution to the problem, and

10   then a resident saying this completely leaves me out in the

11   cold, this doesn't solve any of the real problems that we're

12   having here.  So it kind of underlined that -- at least the

13   possibility that what EGLE does doesn't have a lot of

14   influence here.

15    But help me understand here -- give me your

16   strongest case that what EGLE is looking at here will advance

17   the ball in terms of better understanding or better resolving

18   this case here.

19    MR. D'AUNOY:  My best argument, Your Honor, is

20   deferring to EGLE at this point.  We're not saying your Honor

21   has to dismiss this case, but even staying it and deferring

22   to EGLE at this point, can avoid inconsistent results and

23   consistent remedies.

24    THE COURT:  That's what I'm pushing back on.  How?

25   Give me example of where -- what is inconsistent about EGLE

1    saying -- even if EGLE did its work and said, we don't have

2    find any problem here.  Now that we've done the full panoply

3    of testing, there is not an issue as far as we are concerned.

4    And if I came back here and my jury said there absolutely is,

5    it is a nuisance, that wouldn't be inconsistent from a legal

6    perspective, right?

7            MR. D'AUNOY:  Well, I think Your Honor is looking

8    purely at the damage issue, so we have to remember, in this

9    case, plaintiffs are also looking for injunctive relief, so

10   there is very well the potential for inconsistent remedies in

11   that way.

12           THE COURT:  Why is it inconsistent?  EGLE would be

13   saying, we, EGLE, are not going to enjoin you because our

14   jurisdiction is limited to looking at these regulatory

15   factors.  And my jurisdiction would be saying, a jury has

16   found a nuisance based on nonregulatory factors, which it's

17   allowed to do, and I'm issuing an injunction, but my

18   injunction doesn't suggest that there is a regulatory

19   violation, and EAGLE's decision not to impose some sort of

20   administration injunction doesn't suggest there's not a

21   common law nuisance.  So what's the inconsistency?

22           MR. D'AUNOY:  Well, the tension that I'm

23   envisioning may or could potentially occur, would be that

24   EGLE says you need to do X, Y, Z in order to remediate and

25   solve this issue.  Now, if plaintiff goes out and gets an

 1   expert, we get into the litigation here, and plaintiffs'

 2   expert says you need to do A, B, C in order to mitigate this

 3   issue and to remediate or eradicate the odors, that is a real

 4   tension, because we have the regulatory agency telling the

 5   company you have to do this in order to comply with the law.

 6   And then we are in the court here, and if Your Honor was to

 7   accept plaintiffs' expert's view of the world, you might be

 8   telling FCA US, you have to do A, B, C in order to comply

 9   with the law.  FCA can't comply with both laws, potentially,

10   so that's where the tension comes in.

11        When we are dealing with regulatory issues where we

12   are going to be getting directions from an agency that you

13   have to do X, Y, Z and, potentially, getting directions from

14   a court saying you have to do A, B, C, then that's where we

15   have a tension -- it potentially could be impossible for FCA

16   to comply with both.

17        And that's why we have the doctrine of primary

18   jurisdiction, because we recognize that, in those situations

19   where there is that risk, that the court can just defer to

20   the agency.  It's not saying that this case has to go away,

21   plaintiffs will never get their day in court.  What it is

22   saying is, let that run its course, and we know that there is

23   progress being made, some people may not agree with the level

24   or the progress, but we know there's progress being made, let

25   that run its course, and then let's see what's left and

```
 1   what's left then, would be, you know, what Your Honor would
 2   deal with.  That's the argument that we are making, Your
 3   Honor.
 4            THE COURT:  Okay.  Anything else?
 5            MR. D'AUNOY:  No, Your Honor.
 6            THE COURT:  Thank you.  I appreciate your
 7   arguments.
 8            Mr. Coulson.
 9            MR. COULSON:  Thank you, Your Honor.
10            THE COURT:  Why don't we start with this?  Why
11   isn't Mr. D'Aunoy right when he says the issue here isn't the
12   standard, that if these plaintiffs had come in and said the
13   odor causes me nausea, it causes my eyes to water, I have
14   been out on my back porch trying to entertain family, but
15   haven't been able to do so.  So why isn't he right that those
16   sort of allegations are necessary to make this plausible?
17   And second, why isn't he right that if that was true -- those
18   facts were true, you guys would have added them in when I
19   gave you the chance to do it.
20            MR. COULSON:  Sure.  So if I might, Your Honor, I
21   will take the second question first, which is that, in our
22   experience in doing these cases on a class-wide basis, the
23   more specifics that are included about the named plaintiffs'
24   situation, regardless of how general, regardless of how
25   innocuous they may be, the more the defendant will attempt to
```

1  draw a distinction between those plaintiffs and the class.

2  Rather than get bogged down in that, we do, in general terms,

3  try to describe these things as a much of a common experience

4  as is possible, without distinguishing between the named

5  plaintiffs and the rest of the class.

6  In my experience, in both this and other type of

7  class actions, it's by far the most common way to do it, is

8  to describe a common experience that is incurred by a group

9  of people, a harm of whatever type, whether it's a securities

10  case or a consumer case or an environmental case, and then to

11  plead facts sufficient to determine that the named plaintiffs

12  are a part of that group that suffers that harm.  And so

13  that's what we have done here, but we do have something

14  like 17 paragraphs that specifically discuss the named

15  plaintiffs and the impacts to their homes and properties.

16  I think Your Honor properly inferred here that we

17  are talking about noxious odors and, by definition, that

18  means sickening odors that are physically invading the

19  plaintiffs' homes, both inside and outside.  I don't think

20  it's a generous -- an unreasonable inference from those facts

21  that that's something that would disturb the comfort or

22  convenience of the occupant, as the Court sets out in *Atkins*.

23  That's something that I think on its face would be disturbing

24  to any person.  It is not -- I mean, it is common sense of

25  the most basic order that something that is a sickening odor

```
 1    inside of your home will impact your use and enjoyment of

 2    your home or your comfort and convenience therein.

 3              So for us to have set out more specifics in this

 4    complaint, we take Your Honor's point that certainly it is

 5    not a model of factual specificity, but the federal pleading

 6    standard is not a fact-pleading standard, it is a heightened

 7    notice standard, we just have to set forth facts that give

 8    rise to a plausible claim here, and in our view, we have gone

 9    far past that.

10              THE COURT:  Do they actually allege -- by  "they,"

11    I mean the plaintiffs, that they had any reactions to these

12    odors, any specific reaction?

13              MR. COULSON:  Not specific physical reactions, Your

14    Honor.  We refer to the reactions in general terms of

15    substantial, temporary, physical discomfort in paragraph 23,

16    as the Court has identified.

17              THE COURT:  What was that discomfort for these

18    plaintiffs?  Pretend I'm Mr. D'Aunoy and I'm sitting across

19    the table from Ms. Kendrick and I'm deposing her, and I say,

20    in paragraph 23, you allege that you suffered substantial,

21    temporary physical discomfort.  Would you please describe

22    that for me.  What's her description?

23              MR. COULSON:  Your Honor, I can't give the Court an

24    exact answer to what the client is likely to say there.  What

25    the averment is intended to convey is the general discomfort
```

1   of smelling of foul odor.  Some people will say it burned my

2   nose; some people will say it made me gag; some people will

3   say, I just didn't like the odor.  And I can't tell the

4   Court, today, based on what we've set forth in our pleadings.

5   I can say that there absolutely is a temporary, physical

6   discomfort, but which way each of the plaintiffs would

7   describe that, I can't say today.

8           THE COURT:  Why is that?  Did you interview the

9   plaintiff and do the intake interview?

10          MR. COULSON:  We do -- I did not, personally, Your

11  Honor.  My firm did, and there may be someone in my firm who

12  could answer that, or I could probably actually do it from a

13  review of file.  But this is a model of this pleading we have

14  used in probably two dozen cases in the state of Michigan,

15  and this is not an issue we have had before, and it has been,

16  in our view, in the interest of the class to describe the

17  discomfort in general terms.

18          THE COURT:  Why would you describe the named

19  plaintiffs' discomfort in general terms, but then give

20  specifics about class members?  I mean, if that's your reason

21  for pleading, haven't you just reversed the problem?

22          MR. COULSON:  We've not, Your Honor.  Those were

23  intended to be examples that we think are somewhat eloquent

24  and illustrative of a common experience.  We have data sheets

25  from, I think, somewhere in this case, in excess of 100

1    people, I may be wrong about the exact number, but what we do

2    is we look through the survey responses that we get from all

3    of these people and we see there's a common experience there

4    and we look for examples that we think are not outliers, are

5    not, you know, sort of so vague they don't describe anything,

6    but that adequately describes something that seems to have a

7    common thread between the experience of all of the people;

8    that's why we select the ones that we do.

9         THE COURT:  What do you say to the defendant's

10   argument that this isn't permanent enough?

11        MR. COULSON:  Well, Your Honor, the idea that it

12   needs to be permanent defies the very concept of temporary

13   nuisance, which is recognized under Michigan law.  I think

14   the language in defendant's reply brief refers to something

15   that is not evanescent, and this is certainly not that.  I

16   mean, we talk about these odors invading the plaintiffs'

17   properties on occasions too numerous to list.  These are

18   frequent and recurrent invasions.  If this wasn't an

19   evanescent issue, we would not have made a federal case out

20   of it, and this wouldn't be something that's garnering

21   massive local media attention, it wouldn't have been

22   something that at least dozens and dozens of neighborhood

23   residents have reported to us, that has significantly

24   interfered with their ability to use and enjoy their homes.

25        But the very notion -- I mean, look, Your Honor, we

1   couldn't seek injunctive relief, for example, if this was a

2   permanent nuisance, it if was not something that could be

3   reasonably abated.  This is something that we believe is a

4   temporary nuisance, that it must be a temporary nuisance,

5   because it can be abated, but that doesn't mean that these

6   are fleeting or insignificant conditions.

7        And the description of the harm, when courts use

8   terms like evanescent to talk about this, it's just a further

9   restatement of their requirement that the interference be

10  substantial and unreasonable.  No one would say that it is a

11  substantial or an unreasonable thing to have to smell a very

12  occasional, light, wafting odor across your property, it's

13  just the cost of living in a civilized society or in a

14  developed area.  But when you are talking about something of

15  this magnitude as we described throughout the complaint, that

16  far crosses the threshold into substantial and unreasonable,

17  when you are talking about noxious, sickening, frequent odors

18  both inside and outside the home, that have caused people

19  substantial, contemporaneous physical discomfort.

20       THE COURT:  What else do you want to tell me?

21  Anything else you want to highlight?

22       MR. COULSON:  On the primary jurisdiction issue,

23  Your Honor, I think something that Counsel stated highlights

24  exactly why this is so rarely invoked at this stage of the

25  case.  We face this in almost every one of our cases.  I

 1   don't think it has ever been granted.  It's so heavily based

 2   on an incomplete hypothetical that EGLE could come out with

 3   something in the future and we could have an expert that says

 4   something that is in conflict.  We were involved in

 5   litigating most of the cases, frankly, that outline the

 6   boundaries of the preemptive effect of the Clean Air Act.  It

 7   is clear that the Clean Air Act does not have a preemptive

 8   effect when it comes to source state tort damages -- tort

 9   claims for damages, so the damages component of the case is

10   untouched, and the injunctive relief component of the case is

11   only affected as far as it would interfere with the

12   defendant's permitting or regulatory obligations.

13        If there came a time in this case where we

14   presented something to the Court that the defendant could

15   make even a colorable claim would interfere with its

16   permitting or regulatory obligations or its ongoing

17   discussions with EGLE, then this might be a different

18   discussion, but that's a highly unlikely situation that's

19   never arisen in the dozens of these cases I have done.  It is

20   something that we strenuously try to avoid.  We think that

21   EGLE does perform a necessary and important function here.

22   We would never try to interfere with their work, to the

23   detriment of the class we are seeking to represent.

24        But more importantly, the discovery that we need to

25   conduct in this case and the scheduling of the case, the way

```
 1    we would likely proceed through class certification and
 2    merits discovery, will not differ significantly, if at all,
 3    whether we are dealing with just damages or whether we are
 4    dealing with damages and injunctive relief, we will need all
 5    the same information, one way or the other.  And there is
 6    certainly no argument for staying the plaintiffs' claims for
 7    damages, so the defendant continues to spew noxious emissions
 8    into their neighborhood because they think they might fix the
 9    problem.  I mean, the idea that the harm might eventually
10    stop should delay people from seeking damages is, in our
11    view, not a serious argument.  It's a little bit closer of a
12    call as it relates to injunctive relief, but that's something
13    that the Court could face if and when such a situation ever
14    arises, and in my view, it is extraordinary unlikely, it has
15    never happened before, and the Court, frankly, has our
16    commitment that we would strenuously avoid putting the Court
17    in such a position.
18            THE COURT:  Taking a step back, how do your
19    allegations differ from the allegations in the *Mourad* case
20    that Judge Duggan and the Sixth Circuit said were
21    insufficient to state a nuisance claim?
22            MR. COULSON:  Just one moment, Your Honor.
23    That's -- that's something I don't have in front of me.  We
24    would be happy, if the Court would like, to submit
25    supplemental authority on that, but I don't have the facts of
```

1    that case in front of me right now, at the ready.

2              THE COURT:  Anything else?

3              MR. COULSON:  Not unless the Court has additional

4    questions.

5              THE COURT:  Mr. D'Aunoy, any follow-up?

6              MR. D'AUNOY:  No, Your Honor.  I would be repeating

7    things that I said before, and I will not do that and waste

8    Your Honor's time.

9              THE COURT:  Okay.  I'm going to give you guys a

10   decision now, because this case needs to move forward, so I

11   will give you my decision.

12              The first part of the motion is the motion to

13   dismiss the nuisance claim here, and the primary argument, as

14   Mr. D'Aunoy very persuasively argued this morning, is that

15   the factual allegations are not sufficient to push this over

16   the plausible level.  And while I say Mr. D'Aunoy has done a

17   great job of making the argument, and this complaint is

18   frustrating to me, in that I think it could and should

19   include a lot more information about what happened to these

20   plaintiffs, I think that the allegations of what we call a

21   "significant harm" or a "substantial interference," those are

22   the key elements here that are allegedly lacking, and I think

23   those are plausibly alleged here, although it is very close.

24              The plausibility comes largely for the reasons, I

25   think, explained by Mr. Coulson, that if you combine all of

1   these allegations in here about this picture of what exists

2   in these folks' neighborhood, severe odors, you have the

3   finding by EGLE or the notice where they made a preliminary

4   finding, I think, of moderate to strong offsite paint-solvent

5   odors that were persistent and objectionable, and you have

6   the allegations about the odor being strong and so strong and

7   so foul that can be smelled inside and outside of their

8   homes, and then you have the way that it is generally

9   affecting several other folks in the neighborhood.  When you

10  get all of that together, it does seem to me plausible that

11  the plaintiffs, in experiencing similar conditions, would be

12  suffering temporary physical discomfort as a result of the

13  noxious odors.  And in my view, a temporary physical

14  discomfort is sufficient to establish and to satisfy the

15  substantial interference element of the nuisance claim.

16          What I thought were actually quite instructive,

17  here, were two decisions from Michigan courts dealing with

18  noise nuisance claims.  One is the Michigan Supreme Court

19  decision in *Kobielski v. Belle Isle East Side Creamery*, 222

20  Mich 656, and the other one is a Michigan Court of Appeals

21  decision in a case called *Cooper v. Comer*, 2019 Westlaw

22  1211853.  And they were talking in those cases about when

23  noise can satisfy this substantial interference or

24  unreasonable interference element of a nuisance claim, and

25  the points particularly that the Court of Appeals made is

1    that a physical discomfort doesn't have to rise to the level

2    of an illness or a medical condition in order to satisfy this

3    element, and that physical discomfort caused by noise or

4    odors can be enough.

5         And while I think it's -- again, this is a close

6    question and I think Mr. D'Aunoy did a great job pressing

7    FCA's view here, I think that it is plausible, here, that

8    they suffered temporary, physical discomfort here, and that

9    that's enough.

10        With respect to the question on permanence, in my

11   view, it's also plausibly alleged that this is sufficiently

12   permanent.  I don't think it is evanescent, which is kind of

13   the flip side.  And to me, it is permanent in the sense that

14   at least according to plaintiffs, it is going to keep

15   happening unless it is either enjoined or stopped by EGLE, so

16   that strikes me as sufficient for the permanence point.

17        Also, again going back to *Atkins*, which is talking

18   about the essence of a nuisance claim, talking about

19   disturbance in the comfort and convenience of the occupant

20   and disturbing their reasonable comfort, it, to me, is

21   plausible that that is alleged here -- that that's is

22   happening here.

23        With respect to the plaintiffs' negligence claim,

24   the defendant seeks to dismiss that largely on the basis that

25   the plaintiffs haven't sufficiently pleaded an actual present

```
 1   injury.  In my view, when I read the cases about actual

 2   present injury, they are talking about an actual present

 3   injury as juxtaposed against a mere fear of an injury or a

 4   heightened risk of a future injury, and, to me, the

 5   plaintiffs have alleged an actual present injury in the form

 6   of temporary physical discomfort, not expecting to have some

 7   injury later in the future, so I think that they have

 8   sufficiently pleaded an injury to sustain a negligence claim.

 9           The defendant pointed out in their reply, I think

10   it was, that loss of use and enjoyment of property is not

11   enough to fulfill the injury component of the negligence

12   claim.  So I want to make clear I'm not holding that, but I'm

13   holding that the negligence claim is viable, at least on the

14   basis that the actual present injury is the physical

15   discomfort.

16           And then the last thing is the primary jurisdiction

17   and I'm not going to exercise my discretion to invoke that

18   jurisdiction here.  I think that the common law claim here is

19   sufficiently distinct from what EGLE is doing, and that I

20   don't think there is a risk of conflict or interference and I

21   think that we can go ahead without any risk of interfering

22   with what they are doing and what they are doing is not, to

23   me, going to cut us off here.  If something changes in that

24   regard, I would be pleased to revisit this.

25           Again, I want to emphasize, Mr. D'Aunoy, I thought
```

```
 1    these arguments were very well taken here.  This is a very
 2    close case, but for the reasons I have given, I think that
 3    the claims here cross the plausibility threshold by one iota
 4    or micron, whatever the smallest unit of measurement is, I am
 5    going to swallow hard and find that these claims clear it by
 6    that much.
 7          So the next question is, what's next?  So we will
 8    issue an order to attend a scheduling conference, and that
 9    will have you guys submit a Rule 26(f) report.  Usually I
10    don't hold scheduling conference if there's an agreement in
11    the 26F report, we can just get going.  And what I'm looking
12    for in discovery planning is the most reasonable person wins.
13          Mr. D'Aunoy, Mr. Azar, from your firm, and I have
14    had several calls on discovery issues in one of the many
15    cases that you guys are on, and he can tell you the most
16    reasonable guy in the room wins -- guy, woman, attorney,
17    person, breathing human being.  So when you guys are working
18    on your report, please try to find reasonable common ground.
19    If you can't, then I will get on and hold a scheduling
20    conference, but hopefully you can.
21          Mr. Coulson, anything else on behalf plaintiffs?
22          MR. COULSON:  Nothing further, Your Honor.  Thank
23    you.
24          THE COURT:  Mr. D'Aunoy.
25          MR. D'AUNOY:  No, Your Honor.  Thank you.
```

1    THE COURT:  Thank you.  Thank you for taking time

2  to come up here for the hearing.  I appreciate it.

3    MR. D'AUNOY:  No problem, Your Honor.

4    THE COURT:  Okay.  We are adjourned.

5    THE LAW CLERK:  All rise.  Court is now in recess.

6    (Proceedings concluded at 10:15 a.m.)

7    —   —   —

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of BARBARA KENDRICK, et al., v. FCA US, L.L.C., Case No. 21-12995, on Monday, September 26, 2022.


                              *s/Robert L. Smith*
                              Robert L. Smith, RPR, CSR 5098
                              Federal Official Court Reporter
                              United States District Court
                              Eastern District of Michigan

Date:  11/12/2022
Detroit, Michigan