UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONYA CLAYTON, *et al*.,

       Plaintiffs,

                                  Case No. 21-cv-12995

v.                                Hon. Matthew F. Leitman

FCA US LLC,

       Defendant.

_____/

## ORDER (1) REINSTATING PREVIOUSLY TERMINATED MOTIONS (ECF Nos. 63, 79, 80), (2) GRANTING DEFENDANT'S MOTIONS TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES (ECF No. 79, 80), AND (3) DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF No. 63)

Plaintiffs Tonya Clayton and Hazel Stroble allege that an automobile assembly plant operated by Defendant FCA US LLC ("FCA") near their homes in Detroit, Michigan (the "Detroit Plant") emits noxious odors into their neighborhood. (*See* Sec. Am. Compl., ECF No. 52.)  They say that these odors unreasonably interfere with their ability to use and enjoy the residences that they own and depreciate the values of those residences. (*See id.*)  In this putative class action, Clayton and Stroble assert claims of nuisance and negligence against FCA based on FCA's operation of the Detroit Plant. (*See id.*)

Now before the Court are three motions: Plaintiffs' motion for class certification (*see* Mot., ECF No. 63) and two motions filed by FCA to strike two

expert witnesses – Dr. Mark Cal and Orell C. Anderson – whom Plaintiffs rely upon in support of their class certification motion (*see* Mots., ECF Nos. 79, 80).[1]  For the reasons explained below, the Court **GRANTS** FCA's motions, **EXCLUDES** the opinions of Dr. Cal and Anderson offered in support of Plaintiffs' class certification motion, and **DENIES** Plaintiffs' motion for class certification **WITHOUT PREJUDICE**.  The Court will next convene a status conference with the parties to discuss, among other things, a potential renewed motion for class certification.

**I**

**A**

Plaintiffs Clayton and Stroble own and reside in homes in Detroit, Michigan. (*See* Sec. Am. Compl. at ¶¶ 4–5, ECF No. 52, PageID.655; *see also* Clayton Dep. at 5:6-7, 9:19-10:14, ECF No. 78-4, PageID.1605, 1607-1608; Stroble Dep. at 5:11-7:12, ECF No. 78-5, PageID.1624-1626.)  Both Plaintiffs live within one mile of the Detroit Plant. (*See* Sec. Am. Compl. at ¶ 11, PageID.656.)

FCA is an automobile manufacturer based in Michigan.  FCA owns and operates the Detroit Plant, where it assembles and paints certain automobiles that it

---

[1] The Court held a hearing on these three motions on February 18, 2025.  Following that hearing, the parties agreed to participate in a private mediation.  Based on that agreement, the Court administratively terminated the three motions without prejudice. (*See* Order, ECF No. 112.)  The parties attended a mediation but did not resolve their dispute.  Accordingly, the Court **REINSTATES** the motions to the active docket and resolves them as set forth in this order.

produces. (*See id.* at ¶¶ 7–8, PageID.655-656.)   The Detroit Plant is "situated adjacent to a residential neighborhood," and it appears that more than "10,000 people [may] reside within one mile of the" Plant. (*Id.* at ¶¶ 9–10, PageID.656.)

Plaintiffs claim that the Detroit Plant emits "noxious odors" that, "[o]n occasions too numerous to list," have invaded "Plaintiffs' neighborhood, residences and yards." (*Id.* at ¶ 15.)  More specifically, Clayton says that "[t]he odor [from the Detroit Plant] is so strong that [she] ha[s] to go inside and run [her] house fan to avoid the odors.  [She therefore is] unable to enjoy [her] yard, sit on [her] porch, or garden due to the odor." (Clayton Decl. at ¶¶ 6, 9, ECF No. 63-12, PageID.1250.) Clayton also says that "[t]he odors have been severe enough to make [her] uncomfortable and cause temporary eye discomfort or irritation." (*Id.* at ¶ 11, PageID.1250-1251.)  But Clayton acknowledges that she has "not consulted with a physician about these issues because [she] do[es] not believe the symptoms are causing permanent physical injuries." (*Id.*, PageID.1251.)  Stroble likewise contends that "[t]he odor [from the Detroit Plant] has been so strong that [she] ha[s] had to avoid going outside, and [she] ha[s] to keep the windows shut, even on nice days." (Stroble Decl. at ¶ 9, ECF No. 63-13, PageID.1257.)  Also, like Clayton, Stroble says that "[t]he odors have been severe enough to make [her] uncomfortable and cause temporary eye discomfort or irritation and have made [her] sneeze." (*Id.* at ¶ 12, PageID.1258.)  But she too has "not consulted with a physician about these issues

3

because [she] do[es] not believe the symptoms are causing permanent physical injuries." (*Id.*)  Both Stroble and Clayton insist that the odors from the Detroit Plant "have made [their] propert[ies] less valuable." (*Id.* at ¶ 10, PageID.1257; Clayton Decl. at ¶ 10, ECF No. 63-12, PageID.1250.)

## B

FCA first received a formal complaint about odors emanating from the Detroit Plant in the fall of 2021. (*See* Decl. of L. Alan Johnston, FCA Manager of the North American Corporate Environmental Group, at ¶ 7, ECF No. 78-2, PageID.1586.)  On September 20th of that year, "the State of Michigan, Department of Environment, Great Lakes and Energy ("EGLE") sent a Violation Notice letter to FCA US in which it stated representatives from EGLE observed 'moderate to strong' odors 'downwind' of the [Detroit Plant]." (*Id.*)  FCA responded to EGLE's violation notice on October 11, 2021. (*See id.* at ¶ 8.)  It told EGLE that it "was taking the 'odor concerns very seriously,'" and it "outlined for EGLE [preliminary] mitigation steps that it was taking . . . to reduce the potential for odors to migrate from the [Detroit Plant]" while it "investigat[ed] a permanent corrective solution." (*Id.* at ¶¶ 8–9, PageID.1586-1587.)  Those preliminary "mitigation steps" included ensuring that exterior doors were closed when not in use, installing tarps on de-watering boxes to help minimize odors, and installing an "automated chemical feeding system" to reduce odors from the Detroit Plant's "sludge system." (*Id.* at ¶ 9, PageID.1587.)

Despite those mitigation efforts, FCA nonetheless continued to receive complaints from EGLE about odors emitted from the Detroit Plant.

On December 2, 2022, FCA entered into a stipulation with EGLE to resolve the additional complaints that were lodged after it instituted its initial mitigation efforts. (*See id.* at ¶ 17, PageID.1591.)  Among other things, FCA agreed to pay a $144,000.00 penalty, to spend an additional $147,000.00 on environmental projects in the community around the Detroit Plant, and, most importantly, to install a second regenerative thermal oxidizer (the "RTO2") at the Detroit Plant to reduce odors emitted from the Plant. (*Id.* at ¶ 18.)  FCA says that "[t]he RTO2 was operational by June 30, 2023." (*Id.* at ¶ 21, PageID.1592.)

FCA insists that the RTO2 eliminated much, if not all, of the odor-emission issues at the Detroit Plant.  To that end, FCA notes that "testing . . . confirmed [the RTO2] is operating properly to remove odor causing constituents" at the Detroit Plant. (*Id.*)  FCA further highlights that there has not "been any allegation by EGLE of objectionable odors migrating from the [Detroit Plant] since RTO2 [became] operational" in June 2023. (*Id.*)

And while Plaintiffs do not share FCA's view that the RTO2 has entirely solved the odor problem, they do acknowledge that the new system has made a difference.  More specifically, they agree that modeling of odor levels in the

5

neighborhoods around the Detroit Plant would be "substantially different" after the installation of the RTO2 than it was before that installation.[2]

## C

Now pending before the Court is Plaintiffs' Second Amended Complaint, which is the operative pleading in this action. (*See* Sec. Am. Compl., ECF No. 52.) In the Second Amended Complaint, Plaintiffs assert one count each of nuisance and negligence arising out of FCA's operation of the Detroit Plant. (*See id.*)  They seek damages along with "such other equitable relief as is just under the circumstances." (*Id.*, PageID.661.)

## D

On March 1, 2024, Plaintiffs filed a motion for class certification. (*See* Mot., ECF No. 63.)  In that motion, Plaintiffs ask the Court to certify the following class: "All owner-occupants and renters of residential property located, in whole or in part, within one mile (1.0) of [the Detroit Plant], located at 2101 Connor Street/4000 St. Jean Street, Detroit, Michigan from March 1, 2021 to the present." (*Id.*, PageID.712-713.)

---

[2] Plaintiffs' counsel made the statement identified above at the hearing on the motion for class certification.  The official transcript of that hearing has not yet been prepared.  Based upon the Court's review of its notes and a rough copy of the transcript, the Court is confident that Plaintiffs' counsel made the statement attributed to him above.

In support of their request for class certification, Plaintiffs presented evidence from two expert witnesses: Dr. Mark Cal and Orell C. Anderson.  Dr. Cal "us[ed] atmospheric dispersion modeling" to "to analyze the impacts of nuisance-level odors on the community near [the Detroit Plant]." (Dr. Cal Rep., ECF No. 63-3, PageID.774.)  After analyzing data from October and November of 2021 – data that Dr. Cal acknowledged constituted a "limited sampling period" (*id.*, PageID.775) – Dr. Cal determined that "the entire 1.0-mile proposed class area displayed some level of elevated odor concentrations above [one odor unit per cubic meter]."[3] (*Id.*)  Based on that finding, Dr. Cal concluded that (1) "there [was] no portion of the proposed class area where [FCA's] odors [from the Detroit Plant] were not emitted at detectable concentrations" and (2) "there [was] clear and convincing evidence that odors were dispersed throughout [the] proposed class area at an odor threshold level that residents would find offensive." (*Id.,* PageID.774.)

Anderson offered an opinion related to damages purportedly suffered by the proposed class.  He opined that "if" Plaintiffs hired him to conduct a damages analysis for trial, he could "determine what, if any, impact the odors attributed to the [Detroit Plant] have had on the property values of the homes situated within

---

[3] Dr. Cal explained at his deposition that "[one] odor unit per cubic meter is the level [at which] 50 percent of a particular group, say an odor panel[,] would be able to smell [an odor]. So one odor unit would mean that 50 percent of the people paneled would be able to smell it." (Dr. Cal Dep. at 56:18-22, ECF No. 78-19, PageID.1856.)

7

Plaintiffs' proposed class area." (Anderson Decl. at ¶ 8, ECF No. 63-14, PageID.1266.)  Anderson further contended that "[a]t the end of [his] analysis, if in fact there [was] a demonstrable diminution [of value in Plaintiffs' properties], [he] could attribute a value, or values, of any diminution which could be applied to the class uniformly, irrespective of the differences amongst the individual properties." (*Id.* at ¶ 9.)  Anderson did not actually conduct that analysis or offer an opinion that odors from the Detroit Plant did in fact lower Plaintiffs' property values.  He said only that if asked, he could complete such a study, and he explained the factors that he would consider in that analysis.

FCA filed a response opposing Plaintiffs' motion for class certification. (*See* Resp., ECF No. 78.)  FCA also filed motions to exclude the opinions of Dr. Cal and Anderson. (*See* Mots., ECF Nos. 79, 80.)

The Court held a hearing on the motions on February 18, 2025, and it is now prepared to rule on the motions.

## II

Before turning to Plaintiffs' class certification motion, the Court must first resolve FCA's motions to exclude the opinions of Dr. Cal and Anderson.  The Court with analyze each expert's opinions separately.  For the reasons explained below, the Court will exclude the opinions of both experts.

**A**

As the Sixth Circuit recently recognized, "[w]hen challenged expert testimony is relevant to class certification," a district court "must perform" an "analysis of the evidence" under the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253 (6th Cir. 2024). Conducting such a "[c]areful qualification of experts ensures that expert evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (quoting *Daubert*, 509 U.S. at 597).

"Before admitting expert testimony, [a] district court need[s] to ensure that [an expert's] testimony [is] (a) helpful to the trier of fact, (b) 'based on sufficient facts or data,' and (c) 'the product of reliable principles and methods' that (d) have been 'reliably applied' to the 'facts of the case.'" *In re Onglyza (Saxagliptin) & Kombiglyze (Saxaglitptin and Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) (quoting Fed. R. Evid. 702). The proponent of an expert witness "bears the burden of showing the expert testimony more likely than not" complies with these admissibility requirements. *Id.* n.4. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008)). Finally, "there must be a 'fit' between the inquiry in

9

the case and the testimony [presented]." *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993) (quoting *Daubert*, 509 U.S. at 591). *See also United States v. Smead*, 317 F. App'x 457, 463 (6th Cir. 2008) (explaining that "a district court should ensure that the 'proposed expert testimony . . . fit[s]'" the facts of the case) (quoting *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000)); *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (noting that "Rule 702 requires that the expert testimony must fit the issues in the case").

## B

### 1

The Court begins with Dr. Cal's opinions.  As noted above, he opined that (1) "the entire 1.0-mile proposed class area displayed some level of elevated odor concentrations above [one odor unit per cubic meter]" and (2) "there is clear and convincing evidence that odors were dispersed throughout [the] proposed class area at an odor threshold level that residents would find offensive." (Dr. Cal Rep., ECF No. 63-3, PageID.774-775.)  It is not clear from Dr. Cal's report whether he is offering these opinions with respect to the limited time period for which he had actual sampling data (October and November of 2021) or, alternatively, with respect to the entire time frame covered by Plaintiffs' proposed class definition (March of 2021 to the present).  Either way, his opinions must be excluded.

If Dr. Cal's opinions cover the entire proposed class period, they are not reliable – and must be excluded – because Dr. Cal did not acknowledge or account for the mitigation efforts that FCA undertook beginning in the fall of 2021.  As described above, in October 2021, FCA first implemented a series of preliminary mitigation steps such as ensuring its exterior doors were closed when not in use and using tarps to cover odor-emitting items. (*See* Johnston Decl. at ¶ 9, ECF No. 78-2, PageID.1587.)  Much more importantly, in June 2023, FCA installed the RTO2, and FCA has submitted evidence that the RTO2 has had a meaningful impact on mitigating odors from the Detroit Plant.  (*See id.* at ¶ 21, PageID.1592.)  But Dr. Cal did not mention any of these mitigation efforts, including the installation of the RTO2, in his report.  Indeed, Dr. Cal acknowledged at his deposition that he was not aware of, and did not consider, any mitigation efforts FCA implemented between 2021 and 2023 when reaching his conclusions. (*See* Dr. Cal Dep. at 168:5-169:2, ECF No. 78-19, PageID.1869-1870.)  His failure to consider those mitigation efforts, and to explain what effect, if any, those efforts had on the odor unit level in the proposed class area during the class period (March 1, 2021, through the present), renders his opinions unreliable.  To be clear, Dr. Cal certainly was not required to agree with FCA that its mitigation efforts meaningfully decreased the odors emitted from the Detroit Plant.  But to be reliable, his analysis had to at least acknowledge

those efforts and explain how, if at all, those efforts impacted the odor levels and his analysis.

Next, if Dr. Cal's opinion is limited to the time period for which he had sampling data, then it must be excluded because it is not an appropriate fit for the proposed class. As noted above, Plaintiffs are seeking to certify a class that spans from March 1, 2021, to the present. But an opinion covering only a small fraction of that period – *i.e.*, the two-month period in the fall of 2021 for which Dr. Cal had sampling data – says little, if anything, about whether the criteria for class certification are satisfied for the entire proposed class period. The opinion thus does not fit the proposed class and is not properly considered in support of certifying that class.

For all of these reasons, the Court will exclude the opinions offered by Dr. Cal.

## 2

There is a second and independent reliability problem with Dr. Cal's opinion that the Detroit Plant emitted odor at a "level that residents would find offensive." (Dr. Cal Rep., ECF No. 63-3, PageID.774.) Dr. Cal bases that opinion solely on the fact that the odor emanating from the Detroit Plant was measured at one odor unit per cubic meter. (*See id.*, PageID.775.) But as Dr. Cal acknowledged, at that level, only "50 percent of the people" would even be able to "smell" the odor. (Dr. Cal

Dep. at 56:18-22, ECF No. 78-19, PageID.1856.)   Dr. Cal has not sufficiently explained how an odor that only 50 percent of people can even detect could reasonably be considered offensive to the entire proposed class.   Moreover, his opinion that the class members would find the odor offensive because it measured one odor unit per cubic meter is at odds with his acknowledgment that five odor units per cubic meter, not one, is "generally" the "threshold level that residents would find offensive." (*Id.* at 51:16-52:6, PageID.1851-1852.)   Under these circumstances, there is no reliable basis for Dr. Cal's opinion that all of the members of the proposed class would find the odor level emitted from the Detroit Plant to be offensive.

Plaintiffs counter that it was reliable for Dr. Cal to conclude that all class members would find odors at one odor unit per cubic meter to be offensive because FCA, itself, adopted a mitigation plan for the Detroit Plant that set the "target" for odor emissions at no more than that same level. (FCA Mitigation Plan, ECF No. 63-4, PageID.818-819.)   Plaintiffs interpret that "target" as an acknowledgment by FCA that all members of the proposed class would find odors at the level of one unit per cubic meter to be offensive.   They say that FCA can hardly complain that Dr. Cal reached the same conclusion.

The Court rejects this argument because it rests upon a misinterpretation of FCA's mitigation plan.   Plaintiffs point to no evidence in the record that FCA adopted the one-odor-unit-per-cubic-meter "target" in the plan because FCA

believed that all members of the proposed class would be offended by odors at that level.   And the language of the plan suggests that FCA adopted that target for a different reason.   FCA explained in the plan that it selected that target because doing so was "considered to be a conservative approach." (*Id.*, PageID.818.)   On this record, the Court cannot conclude, as Plaintiffs contend, that FCA has admitted that odor emissions at the target level would be offensive to all members of the proposed class.   The Court therefore cannot accept Plaintiffs' argument that Dr. Cal's conclusion was reasonable because it mirrored FCA's own thinking.

## C

The Court next turns to Anderson's opinion that he could develop a reliable model to determine the economic damages suffered by the proposed class members. The Court will exclude that opinion because the model that Anderson proposes to develop is not a proper fit for Plaintiffs' proposed class.   As noted above, Plaintiffs seek to certify a class that includes both "owner-occupants and renters" in the class area. (Mot., ECF No. 63, PageID.712-713.)   But Anderson's proposed model does not apply to renters.   In fact, he has not been asked "quantify [what impact], if any, [there was] on property renters," and he has not "given [that issue] any thought." (Anderson Dep. at 60:2-8, ECF No. 92-1, PageID.3405.)   Instead, he intends to measure only the diminution in property values caused by the odors emanating from

the Detroit Plant, and it is only property owners that could have suffered such a potential diminution.

That Anderson's proposed model does not apply to renters is a significant problem because FCA has presented evidence that approximately 45% of the proposed class members are renters, not owners. (Rep. of FCA expert Trevor Phillips at ¶ 111, ECF No. 79-3, PageID.2123.)  Because Anderson's proposed model does not apply to the many renters in the proposed class, it is not a proper fit for that class. *See Sines v. Darling Ingredients, Inc.*, No. 19-19121, 2023 WL 3841741, at *12 (D.N.J. June 6, 2023) (excluding proposed damages expert in case arising out of allegedly noxious odors where expert "fail[ed] to account for renters who are part of the putative class" and explaining that "[r]enters – who have no ownership interest in the property they occupy – cannot suffer diminution in property value damages").

For all of these reasons, the Court excludes Anderson's opinions and will not consider them when ruling upon Plaintiffs' class certification motion.[4]

---

[4] FCA also argued that the Court should exclude Anderson's opinions because Anderson "has not conducted any actual analysis" and instead, he says only that he *could* offer a diminution-in-value analysis if asked to do so at trial. (Mot., ECF No. 79, PageID.2008.)  The Court declines to exclude Anderson on that basis.  "[T]here is no categorical prohibition on a district court relying on an unexecuted damages model to certify a class." *Noohi v. Johnson & Johnson Consumer Inc.*, -- F.4th --, No. 23-55190, 2025 WL 2089582, at *4 (9th Cir. July 25, 2025) (quoting *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1029 (9th Cir. 2024)).  Instead, "evaluation of an unexecuted damages model at class certification 'requires determining whether the expert's methodology is reliable[.]'" *Id.* (quoting *Lytle*, 114 F.4th at 1031).  Here,

### III

Having resolved FCA's motions to exclude Plaintiffs' experts, the Court now turns to Plaintiffs' motion for class certification. For the reasons explained below, the Court denies that motion without prejudice.

### A

"Generally, a district court enjoys broad discretion to decide whether class certification is appropriate." *In re Ford Motor Co.*, 86 F.4th 723, 727 (6th Cir. 2023). The Sixth Circuit has offered the following helpful overview of the procedure for class certification under Rule 23 of the Federal Rules of Civil Procedure where, as here, the Plaintiffs seek to proceed under Rule 23(b)(3):

> To obtain class certification, the plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). These four requirements— numerosity, commonality, typicality, and adequate representation—serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members. [*Wal-Mart Stores, Inc. v.*] *Dukes*, 131 S.Ct. at 2550.

---

because the Court concludes that Anderson's methodology is not a fit for the class as currently proposed, it excludes his opinions at this stage of the proceedings.

In addition to fulfilling the four prerequisites of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b). *Dukes*, 131 S.Ct. at 2548; *Young* [*v. Nationwide Mut. Ins. Co.*], 693 F.3d at 537 [(6th Cir. 2012)]. The plaintiffs sought class certification under Rule 23(b)(3), which requires the district court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members" and that the class action is "superior to other available methods" to adjudicate the controversy fairly and efficiently. The plaintiffs carry the burden to prove that the class certification prerequisites are met, *In re Am. Med. Sys., Inc.*, 75 F.3d [1069,] 1079 [(6th Cir. 1996)], and the plaintiffs, as class representatives, were required to establish that they possess the same interest and suffered the same injury as the class members they seek to represent. *Dukes*, 131 S.Ct. at 2550.

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850–51 (6th Cir. 2013).  "Plaintiffs must actually *prove*—not simply plead—that their proposed class satisfies each requirement.   In assessing this proof, the district court must conduct a rigorous analysis to determine whether the plaintiff has met each of these requirements." *In re Nissan*, 122 F.4th at 246 (internal citations and quotation marks omitted) (emphasis in original).  "If [a plaintiff] fails to satisfy any of these requirements, class certification is not appropriate."  *Davis v. Cintas Corp.*, 717 F.3d 476, 483–84 (6th Cir. 2013); *Garcia v. Johanns*, 444 F.3d 625, 631 (D.C. Cir. 2006) ("Failure to adequately demonstrate any of the four [23(a) factors] is fatal to class certification.").

**B**

The Court's analysis begins – and ends – with the related requirements of typicality and adequacy.  Typicality requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  To be typical, the named plaintiffs' interests must be aligned with those of the class such that by pursuing his own claims, the named plaintiff "will also advance the interests of the class members." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996).  In general, "[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082).  However, a plaintiff's claim is not typical if the plaintiff is "subject to unique defenses which threaten to become the focus of the litigation." *Cahoo v. Fast Enters. LLC*, 508 F.Supp.3d 138, 158 (E.D. Mich. 2020) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)).

Adequacy requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To be adequate, the named plaintiff "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 625–26 (1997) (cleaned up).   The Sixth Circuit looks to two criteria for determining adequacy of representation: (1) "the representative must have common interests with unnamed members of the class"; and (2) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012).

For several reasons, the Court concludes that neither Clayton nor Stroble satisfy the typicality and adequacy requirements for the currently-proposed class. First, FCA has a substantial defense to their negligence claim that is not applicable to the class as a whole.   That defense is that their negligence claim fails as a matter of law because, as they concede, they have not suffered any kind of physical injury from the alleged odors.[5] (Clayton Decl. at ¶ 11, ECF No. 63-12, PageID.1250-1251; Stroble Decl. at ¶ 12, ECF No. 63-13, PageID.1258.)   The defense has substantial support in binding Sixth Circuit case law.   Indeed, the Sixth Circuit has held that "[i]n Michigan, 'present physical injury' is necessary to state a claim for negligence." *Means v. United States Conf. of Catholic Bishops*, 836 F.3d 643, 653 (6th Cir. 2016) (quoting *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 691 (Mich. 2005)).[6]  Notably, some members of the proposed class may not be subject to this

---

[5] At the hearing on Plaintiffs' motion for class certification, counsel for Plaintiffs confirmed that neither Clayton nor Stroble has a cognizable physical injury claim.

[6] To be clear, the Court reaches no conclusion on the *merits* of a possible no-physical-injury defense.   The Court's task at this stage is not to decide that question.

defense because the impact of the odors on their health is alleged to have been more serious and/or long-lasting, and those class members may be able satisfy the personal injury requirement for a negligence action identified by the Sixth Circuit. For example, proposed class member Vincent Burke reported that "the smell [from the Detroit Plant] has caused [him] nausea and illness from frequent vomiting" that resulted in him "go[ing] to the hospital." (Data Sheets, ECF No. 63-10, PageID.1137.) Proposed class member Tammi Henry asserted that "since living at [her] address [near the Detroit Plant], [she] ha[s] been diagnosed with asthma." (*Id.*, PageID.1169.) And proposed class member Michael Forbes said that his "wife suffers from bronchitis" and that the "odors inside his home" from the Detroit Plant have led to that bronchitis "g[etting] worse." (*Id.*, PageID.1156.) Other proposed class members have raised similar complaints about the impact of the odor emissions that may be sufficient to satisfy the injury requirement. (*See e.g.*, *id.*, PageID.1122, 1183, 1242.) Clayton and Stroble may not appropriately represent these class members because Clayton's and Stroble's negligence claims could well be dismissed on a basis that may not warrant dismissal of these members' claims. *See Beck v. Maximus*, 457 F.3d 291, 301 (3d Cir. 2006) (explaining that a proposed class representative is not adequate "if the representative is subject to a unique defense

---

The question for the Court to decide now is whether someone who may be *subject* to such a unique defense is the appropriate party to represent the proposed class.

that is likely to become a major focus of the litigation"); *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556 (M.D. Tenn. 2019) ("Defendants do not have to *prove* a unique defense against the proposed class representatives to defeat certification. It is problem enough that the proposed representatives are 'subject to such defenses,' which 'renders their claims atypical of other class members.'" (quoting *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 314 (E.D. Va. 2007))).

Moreover, Clayton and Stroble do not satisfy the typicality and adequacy requirements because their individual incentives diverge in some meaningful respects from those of some class members. *See*, *e.g.*, *In re Am. Med. Sys. Inc.*, 75 F.3d at 1082–83 (explaining that "[a] necessary consequence of the typicality requirement is that" a named class representative "will . . . advance the interests of the [entire] class," and noting that "in the absence of typical claims, a class representative has no incentives to pursue the claims of the other class members"); *Amchem Prods., Inc.*, 521 U.S. at 625–26 (explaining that class "[r]epresentatives must . . . possess the same interest and suffer the same injury as the class members"). For instance, because Clayton and Stroble own their own homes within the proposed class boundary, they have no incentive to present a damages model that calculates and/or reflects damages suffered by the roughly 45% of the proposed class who rent their homes.  Likewise, since neither Clayton nor Stroble claim to have suffered any physical injuries, they have no incentive to present evidence concerning such injuries

and to seek damages for those injuries.  Simply put, Clayton and Stroble have zero incentive to present substantial evidence that may be important to many members of the proposed class.  Under these circumstances, they may not appropriately represent the class. *See*, *e.g. Sines*, 2023 WL 3841741, at *4 (denying motion for class certification where, as here, the "named Plaintiffs' interests [were] not sufficiently aligned with the interests" of the class because while "numerous putative class members ha[d] described adverse health impacts" from alleged noxious odors, "the named Plaintiffs ha[d] admitted that they [were] not seeking damages for physical injury") (internal quotation marks omitted)); *Thornburg v. Ford Motor Co.*, No. 19-cv-01025, 2022 WL 4348475, at *7–8 (W.D. Mo. Sept. 19, 2022) (denying class certification and holding that named plaintiff had failed to establish adequacy or typicality where plaintiff did not seek damages for personal injury from alleged noxious odors from automotive facility).

For all of these reasons, Clayton and Stroble have not carried their burden to show that their claims are typical of the claims or defenses of the proposed class or that they will fairly and adequately protect the interests of the class as currently defined.  Their motion for class certification motion therefore must be denied.[7]

---

[7] Given the Court's conclusion that Clayton and Stroble have not met their obligations under Rule 23(a), "the Court need not" decide whether they have satisfied their burden under Rule 23(b) to show predominance and superiority. *Lindke v. King*, No. 22-cv-11767, 2025 WL 242833, at *11 (E.D. Mich. Jan. 17, 2025) (quoting *Cleary v. Phillip Morris USA, Inc*., 265 F.R.D. 289, 293 (N. D. Ill.

**IV**

While the Court concludes that the class as currently defined and proposed should not be certified, as the Court indicated during the hearing on Plaintiffs' class certification motion, it is at least possible that *some* class, group of sub-classes, or issue classes could be certified in this case.  The Court will therefore convene a status conference with counsel for all parties to discuss next steps in this case, including the possibility of allowing Plaintiffs to file a renewed motion for class certification.

**V**

For all of the reasons explained above, FCA's motions to exclude Plaintiffs' expert witnesses (ECF Nos. 79, 80) are **GRANTED**, and Plaintiffs' motion for class certification (ECF No. 63) is **DENIED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  August 7, 2025          UNITED STATES DISTRICT JUDGE

---

2010)). *See also Stevens v. Ford Motor Co.*, No. 18-CV-00456, 2022 WL 19978265, at *24 (S.D. Tex. Sept. 29, 2022) (concluding that it was "unnecessary to determine whether [the party seeking class certification met] Rule 23(b)(3)'s predominance and superiority requirements" where the party "failed to carry [its] burden on the Rule 23(a) . . . requirements"); *Brown v. Porter McGuire Kiakona & Chow, LLP*, No. CV 17-00554, 2019 WL 254658, at *11 (D. Haw. Jan. 17, 2019) ("Because the proposed class[] do[es] not meet the Rule 23(a) requirements, it is not necessary to address the Rule 23(b) requirements."); *Trawinski v. KPMG LLP*, No. 11 Civ. 2978, 2012 WL 6758059, at *5 n.2 (S.D.N.Y. Dec. 21, 2012) ("Because the Court concludes that [plaintiff] does not meet all the requirements of Rule 23(a), it is not necessary to also address whether Rule 23(b) is satisfied.").

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 7, 2025, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126